FILED

APR - 8 2009

Clerk, U.S. District and
Bankruptcy Courts

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
------------------------------------------------------------------- X

Han Kim
5511 Wooded Creek Drive
St. Charles, MO

and

Yong Seok . Kim
5511 Wooded Creek Drive
St. Charles, MO,

                        Plaintiffs,

                   -against-

DEMOCRATIC PEOPLE'S REPUBLIC OF KOREA,
a.k.a. NORTH KOREA.
Ministry of Foreign Affairs
c/o Foreign Minister, Pak Ui Chun
Jung song-dong, Central District
Pyong Yang, DRK

                    and

JOHN DOES 1-10.

                        Defendants.
------------------------------------------------------------------- X

Case: 1:09-cv-00648
Assigned To : Roberts, Richard W.
Assign. Date : 4/8/2009
Description: General Civil

**COMPLAINT**

**Jury Trial Demanded**

JURY ACTION

## COMPLAINT

Plaintiffs, by their attorneys, complain of the defendants and allege the following upon information and belief:

## INTRODUCTION

1. This is an action for intentional infliction of emotional distress, loss of consortium and solatium and related torts, pursuant to the Foreign Sovereign Immunities Act

("FSIA") 28 U.S.C. §1602 *et seq.*, brought by the American brother and son of a United States permanent resident who was illegally abducted by North Korean agents from China, unlawfully imprisoned, tortured and subsequently murdered by starvation in a North Korean prison camp. The kidnapping of Reverend Kim Dong Shik (hereinafter "the abduction") was carried out by agents of the North Korean security services sent to the Chinese border town of Yunji to abduct the Presbyterian missionary. For several years prior to the abduction, Reverend Kim had been providing assistance to those fleeing North Korea for both political and humanitarian reasons and had set up shelters and a school for the children of the refugees. The North Korean government carried out the abduction in violation of Article 1 of the International Convention Against the Taking of Hostages, inflicted physical injury upon him within the meaning of torture under section 3 of the Torture Victim Protection Act of 1991 (28 U.S.C. § 1350 *note*) and subsequently carried out his extra-judicial killing in a North Korean prison camp within the meaning of 28 U.S.C. §1350 *note*.

## JURISDICTION

2. This Court has jurisdiction over this matter and over the defendants pursuant to 28 U.S.C. §§ 1330(a), 1330(b), 1331, 1332(a)(2), 1350 *notes* and 1605A(a)(1), which create subject-matter and personal jurisdiction for civil actions for wrongful death, hostage taking, torture and personal injury against state sponsors of terrorism and their officials, employees and agents.

## NATURE OF THE ACTION

### The Abduction and Murder of Reverend Kim

3.  Reverend Kim was born in South Korea in 1947. He graduated Koshin University in Pusan and was ordained as a Presbyterian minister. He was the father of two children from his first marriage and had adopted five additional children with his second wife. Reverend Kim was employed for many years as a minister in South Korea on behalf of the Chicago Evengelical Holiness Church a Korean-American church located in Illinois.

4.  In 1993 he moved to China to work as a missionary providing humanitarian and religious services to the families of North Korean defectors and refugees who had fled across the Sino-Korean border seeking asylum from the Communist regime.

5.  At the time, tens of thousands of North Koreans were living in China after fleeing the dismal humanitarian conditions and political oppression in their homeland. There have been famines, starvation and widespread shortages of basic food supplies in North Korea for decades. Humanitarian conditions and health care in neighboring China are known to be at a much higher standard and many North Korean citizens have risked arrest and imprisonment to escape to China in order to feed themselves and care for their families. In addition, the repressive North Korean government controls its citizens with brutal policies and violations of basic human rights, arbitrary imprisonment, torture and executions without fair trials are rampant.

6.  In the Chinese town of Yunji, Reverend Kim set up numerous refugee shelters and a school to educate expatriated North Korean children and handicap persons. He named the school "The School of Love."

7.  The government of North Korean and its State Safety and Security Agency strove

to stop the flow of political defectors and refugees which were a political embarrassment and destabilized the totalitarian regime. North Korea increased its military patrols along the Chinese border. The security services gather information against those seeking to defect and carry out pre-emptive arrests and imprisonments. North Korean border guards have a policy of shooting to death anyone attempting to escape North Korea for China. In addition, the security services have organized squads of agents who crossed into Chinese border towns in order to hunt down North Koreans who have fled. These agents frequently disguise themselves as refugees and infiltrate the shelters and hide outs of those who have successfully reached China. Once located, the agents forcefully abduct the refugees and bring them back across the border to North Korea where they are imprisoned in harsh labor camps, tortured, undergo "re-education" programs and in many instances are executed. The most severe sentences and treatment is inflicted by North Korea on those refugees who are Christian activists or who have attempted to make their way to South Korea, North Korea's most bitter enemy.

8. The North Korean security service learned of Reverend Kim's activities on behalf of the defectors and refugees and decided to kidnap him and bring him to North Korea to thwart his work on behalf of the those who have escaped.

9. In April 1999 a North Korean agent, who operated under the pseudonym *Lee Sun Hee* made Reverend Kim's acquaintance while posing as a defector. For ten months she kept in close contact with Reverend Kim and reported to her superiors on his activities as the abduction plan was being organized by the security services. According to the confessions of a member of the abduction squad, Kim Hak Ju, who was eventually arrested and prosecuted in South Korea for his role in the kidnappings, the agents operated under instructions from a senior North Korean state-security official who was charged with kidnapping defectors and others

deemed to be working against the interest of the North Korean government and the Communist Party.

10.     On January 16, 2000, Lee Sun Hee arranged to meet with Reverend Kim at a restaurant under the pretense that she wanted to introduce him to two other recent defectors After eating a meal together and leaving the restaurant, Reverend Kim was forced inside a taxi by the agents.

11.     As the pastor was placed in the front seat of a taxi, two of the abductors jumped in the back and forced the cabbie to drive off. The taxi drove Reverend Kim out of Yunji city and transferred him in Sanhe to another car that transported him to the Sino-Korean border near the crossing on the Tumen River. That same evening the abductors are believed to have taken him across the border to North Korea.

12.     Reverend Kim was imprisoned in a labor camp in North Korea for political detainees where he underwent brutal torture. The North Koreans insisted that he renounce his religious beliefs and adopt Juche, the officially enforced political ideology of the North Korean government is based upon the philosophy of the previous dictator Kim Il sung formulated in the 1950s.

13.     When Reverend Kim refused to adopt the Juche ideology and submit to his torturers he was punished by being deprived of all food. by his jailers.

14.     Upon information and belief Reverend Kim died of malnutrition and the aftereffects of the torture inflicted upon him during his imprisonment.

15.     Although the exact date and location of Reverend Kim's death are not known, his remains are believed to be in People's Army Camp 91, a garrison in Sangwon, a suburb on the outer skirts of Pyongyang.

16. Reverend Kim's family living in the United States learned of his disappearance the day after his kidnapping. Associates of Reverend Kim called his family and reported that he was missing and no one in Yunji knew where he was. The family immediately contacted the Chinese government and police and representatives of the government of South Korea. They were unable, however, to discover any information concerning his whereabouts or circumstances. Despite their vigilant efforts they did not manage to obtain any accurate information concerning him for many years. No one had seen the kidnapping or knew with whom Reverend Kim had been meeting that day in Yunji. The family was able to even confirm that he had been taken to North Korea or that he remained imprisoned there.

17. The close-knit Kim family suffered extreme emotional distress, anxiety, fear and depression as a result of being unable to even determine where the Reverend was or whether he was still alive. Naturally, they feared for the worst and were devastated by their inability to find any witnesses to his abduction. They clung to each scrap of information and unofficial report that they could garner from North Korean exiles. The family spoke to scores of refugees and missionaries working in China during this time but no one was able to provide any first hand information about Reverend Kim's circumstances. The family never stopped seeking out new sources and praying that Reverend Kim would eventually return to them.

18. Finally, in 2005 several former North Korean agents were arrested by South Korean law enforcement officials and prosecuted for abducting refugees who had escaped to China. From these individuals some new information concerning Reverend Kim's arrest, imprisonment and death was provided to the family. Most importantly, five years after his arrest the family learn for the first time from those charged by South Korea with Reverend Kim's abduction that he had been taken to North Korea and tortured to death. Cruelly, until today the

North Korean government continues to refuse to publicly acknowledge that they had kidnapped Reverend Kim in 2000 and that he had died in a prison camp. Similarly, North Korea refuses to release Reverend Kim's remains to the family. As such, the Kims remain shattered and inconsolable over their inability to achieve any closure over their missing loved one's fate.

## THE PARTIES

### A. The Plaintiffs

19. Yong Seok Kim was on January 16, 2000 and remains today a national of the United States. He is the younger brother of Reverend Kim. Like the rest of his family he experienced severe shock and anguish over the news of Reverend Kim's sudden disappearance. As a result o his brother's abduction and murder by the Defendants, Yong Kim has experienced emotional pain and suffering, loss of his brother's society, companionship, comfort, advice and counsel and has suffered severe mental anguish and extreme emotional distress.

20. Han Kim received his American citizenship in 2003 and remains today a national of the United States. He is the son of Reverend Kim. Like the rest of his family he experienced severe shock and anguish over the news of his father's sudden disappearance As a result of his father's abduction and murder by the Defendants, Han Kim has experienced emotional pain and suffering, loss of his father's society, companionship, comfort, advice and counsel and has suffered severe mental anguish and extreme emotional distress.

### B. The Defendants

21. At all times relevant to this Complaint, Defendant North Korea was a foreign state within the meaning of 28 U.S.C. § 1603, designated as a state sponsor of terrorism in 1988 pursuant to § 6(j) of the Export Administration Act of 1979 (50 U.S.C. App. § 2405(j)) after the Secretary of State determined that "North Korea is a country which has repeatedly provided support of acts of international terrorism." *Notice, Determination Pursuant to Section 6(j) of the Export Administration Act of 1979; North Korea*, 53 Fed. Reg. 3477 (Feb. 5, 1988), 1988 WL 276528.

22. North Korea has engaged in and provided support and resources for the commission of acts of extrajudicial killing, hostage taking and torture, within the meaning of 28 U.S.C. § 1605A, including the unlawful abduction, illegal detention, torture and murder of Reverend Kim that resulted in grievous harm to the Plaintiffs herein. The government of North Korea is politically and ideologically hostile to the United States and its allies, and has consistently sponsored acts of international terrorism, extra-judicial killings, hostage taking and torture. On October 11, 2008, North Korea was removed from the list of designated states by the United States State Department.

23. Pursuant to 28 U.S.C. § 1603A(a)(2) United States citizens can continue to file lawsuits for a six month period following North Korea's removal from the list.

24. At all times relevant to this Complaint, Defendants John Does 1-10 are and were officials, employees and agents of North Korea, who within the scope of their office, employment and agency engaged in the commission of acts of extrajudicial killing, hostage taking and torture including the abduction and murder of Reverend Kim and performed actions that caused harm to the Plaintiffs herein.

## FACTUAL ALLEGATIONS

### Defendant North Korea Has Routinely Engaged in Abductions, Torture and the Murder of Political Prisoners

25. Defendant North Korea is a one-party totalitarian state modeled as a Stalinist dictatorship. The supreme leader Kim Il Dong, the son of the former ruler, presides over his citizens with an iron fist that limits all political and economic freedoms and allows no tolerance for dissent. Every aspect of social, political, and economic life is tightly controlled by the state. Human rights organizations have identified the North Korean regime as one of the most repressive with a brutal record of human rights violations. Those who have managed to escape from North Korea have reported that torture, starvation, rape, medical experimentation, forced labor and murder are utilized by the regime and its security services to maintain complete control over the population. The death penalty is regularly imposed on those accused of even minor political infractions against the state.

26. In addition to its dismal human rights record, the regime has a history of regional military provocations, proliferation of military-related items, and long-range missile development. It regularly engages in militant rhetoric and threats against South Korea, its main opponent and the United States. North Korea maintains one of the largest armies in the world. In addition, North Korea is suspected of operating a Weapons of Mass Destruction program in violation of international treaties. It has periodically violated international arms control treaties.

27. Defendant North Korea has regularly been involved in the abduction and imprisonment of foreign citizens. In 2002, the regime publicly admitted that it's security services

had engaged in the kidnapping of Japanese citizens between 1977 and 1983. While some surviving victims and their families were allowed to leave North Korea and return to Japan numerous other cases of Japanese detainees remain unresolved. In October 2005, the Defendant acknowledged for the first time having kidnapped South Korean citizens in previous decades, claiming that several abductees, as well as several POWs from the Korean War, were still alive in North Korea. South Korea claims that almost 500 of its citizens have been abducted and imprisoned by the Defendant since the end of World War II.

28. According to a United States Department of State report those imprisoned in North Korea are subjected to brutal conditions:

> "Methods of torture and other abuse reportedly included severe beatings; electric shock; prolonged periods of exposure to the elements; humiliations such as public nakedness; confinement for up to several weeks in small "punishment cells" in which prisoners were unable to stand upright or lie down; being forced to kneel or sit immobilized for long periods; being hung by the wrists; being forced to stand up and sit down to the point of collapse; and forcing mothers recently repatriated from China to watch the infanticide of their newborn infants.
>
> "Reeducation through labor, primarily through sentences at forced labor camps, was a common punishment and consisted of tasks such as logging, mining, or tending crops under harsh conditions. Reeducation involved memorizing speeches by Kim Jong-il . . .
>
> "Those sentenced to prison for nonpolitical crimes were typically sent to reeducation prisons where prisoners were subjected to intense forced labor. Those who were considered hostile to the regime or who committed political crimes, such as defection, were sent to political prison camps indefinitely. Many prisoners in political prison camps were not expected to survive. The government continued to deny the existence of political prison camps.
>
> "Reports indicated that conditions in the political prison camps were harsh. Systematic and severe human rights abuses occurred throughout the prison and detention system. Detainees and prisoners consistently reported violence and torture. According to refugees, in some places of detention, prisoners received little or no food and were denied medical care. . . "
>
> United States Department of State 's <u>Country Reports on Human Rights Practices - 2007: Democratic People's Republic of Korea</u>.

29. Defendant North Korea is extremely zealous of its international image and has

undertaken a campaign to hunt refugees and defectors who might publicly denounce the regime's policies or report on the desperate economic or political situation in the country. The North Korean security services operate teams of agents who are charged with abducting those who have fled and forcibly returning them to North Korea. Once repatriated to North Korea, these individuals are imprisoned, tortured and frequently executed or subject to starvation.

30. During the period relevant to Reverend Kim's abduction and murder, North Korea agents regularly infiltrated into Chinese border towns and organized operations to abduct refugees and return them to North Korea.

31. Following the arrest and prosecution in 2005 in South Korea of several former North Korean agents involved in abductions, it was revealed that Reverend Kim's activities in China on behalf of the refugees and defectors had caused great concern to the Defendant North Korea. In the course of their subsequent court testimony, they detailed how a plan was organized to abduct Reverend Kim and they began to track his movements in Yunji ten months before his kidnapping. A female agent, posing as a refugee, was ordered to strike up an acquaintance with Reverend Kim and win his confidence in order to facilitate his abduction.

32. On January 16, 2000, the agent along with two others met Reverend Kim in Yunji and forced him inside a taxi cab. They then proceeded to transport him to the Sino-Korean border and smuggle him to North Korea.

33. Once in the custody of the Defendant North Korea, Reverend Kim was imprisoned, subject to harsh torture and made to undergo "re-education" training. When the Defendant was unable to force Reverend Kim to abandon his religious beliefs and convert to the Juche ideology they cruelly deprived him of food and starved him to death. Reverend Kim died of malnutrition and the aftereffects of his brutal torture. Until today the Defendant North Korean

refuses to acknowledge Reverend Kim's abduction or his murder in a North Korean prison camp. The Defendant refuses to release Reverend Kim's remains to the his family.

34. The Defendants' abduction, torture and murder of Reverend Kim were acts of hostage taking, torture and extra-judicial killing pursuant to 28 U.S.C. §1605A(a)(1) and resulted in grievous harm to the Plaintiffs Han Kim and Yong Seok Kim.

### FIRST CLAIM FOR RELIEF
### AS AGAINST ALL DEFENDANTS ON BEHALF OF ALL PLAINTIFFS
### ACTION FOR DAMAGES UNDER 28 U.S.C. §1605A(c)

35. Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

36. North Korea is a foreign state that at all relevant times has been designated as a state sponsor of terrorism within the meaning of 28 U.S.C. §1605A.

37. North Korea and the other defendants engaged in hostage taking, torture and extra-judicial killing within the meaning of 28 U.S.C. §1605A, which resulted in the abduction, brutal torture and murder of Reverend Kim.

38. Defendants John Does 1-10 are officials, employees, and/or agents of Defendant North Korea, and they facilitated and carried out the abduction, torture and murder of Reverend Kim within the scope of their office, employment and/or or agency.

39. The abduction, torture and murder of Reverend Kim was a hostage taking, torture and an extrajudicial killing within the meaning of 28 U.S.C. §1605A.

40. The Plaintiffs suffered severe injury, including: pain and suffering; pecuniary loss and loss of income; loss of guidance, companionship and society; loss of consortium; severe

emotional distress and mental anguish; and loss of solatium.

41. The harm and injuries suffered by the decedents and the Plaintiffs due to the abduction and murder were the direct and proximate result of defendants' conduct described herein.

42. Defendants are therefore jointly and severally liable for the full amount of Plaintiffs' damages under 28 U.S.C. §1605A(c), in such sums as may hereinafter be determined.

43. Defendants' conduct was criminal in nature, outrageous, extreme, wanton, willful, malicious, and constitutes a threat to the public warranting an award of punitive damages under 28 U.S.C. §1605A(c).

### SECOND CLAIM FOR RELIEF
### AGAINST ALL DEFENDANTS ON BEHALF OF ALL PLAINTIFFS
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS PURSUANT TO
### MISSOURI AND CALIFORNIA LAW OR OTHER APPLICABLE LAW

44. Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

45. Defendants' conduct was willful, outrageous, egregious, and dangerous to human life, and violates applicable criminal law, all international standards of civilized human conduct and common decency.

46. Defendants did in fact illegally abduct, torture and unlawfully detain Reverend Kim and in doing so psychologically terrorized the Plaintiffs and caused them severe emotional distress.

47. Defendants' conduct was outrageous in the extreme, wanton, willful and malicious, and constituted a threat to the public at large warranting an award of punitive damages.

## THIRD CLAIM FOR RELIEF
## AGAINST ALL DEFENDANTS ON BEHALF OF ALL PLAINTIFFS
## LOSS OF CONSORTIUM AND SOLATIUM PURSUANT TO
## MISSOURI AND CALIFORNIA LAW OR OTHER APPLICABLE LAW

48. Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

49. At all relevant times, Plaintiffs Han K. Kim and Yong Seok Kim were, respectively, the son and brother of Reverend Kim.

50. As a result, and by reason of the disappearance and death of Reverend Kim, which was caused by the actions of Defendants described herein, the Plaintiffs were deprived of the services, society and solatium of their father and brother and suffered severe mental anguish, bereavement and grief, and injury to their feelings

51. Defendants' conduct as specified herein was outrageous in the extreme, wanton, willful and malicious, and constitutes a threat to the public at large. Plaintiffs are therefore entitled to an award of punitive damages against Defendants in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

(a) Enter judgment against Defendants, jointly and severally, in favor of each Plaintiff for compensatory damages in amounts to be determined at trial;

(b) Enter judgment against Defendants, jointly and severally, in favor of each Plaintiff for punitive damages in amounts to be determined at trial;

(c) Enter judgment against Defendants in favor of each Plaintiff for any and all costs sustained in connection with the prosecution of this action, including attorneys' fees; and

(d) Grant such other and further relief as justice requires.

PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.

Dated: April 7, 2009
Brooklyn, New York

Respectfully submitted,

THE BERKMAN LAW OFFICE, LLC
*Counsel for Plaintiffs*

By: /s/ Robert J. Tolchin
Robert J. Tolchin
(D.C. Bar #NY0088)

111 Livingston Street, Suite 1928
Brooklyn, New York 11201
(718) 855-3627
Fax: (718) 504-4943

NITSANA DARSHAN-LEITNER & CO.
Nitsana Darshan-Leitner
(International co-counsel)
10 Hata'as Street
Ramat Gan, 52512 Israel