UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                )
HAN KIM, <u>et al.</u>,            )
                                )
          Plaintiffs,           )
                                )
          v.                    )      Civil Action No. 09-648 (RWR)
                                )
DEMOCRATIC PEOPLE'S REPUBLIC    )
of KOREA, <u>et al.</u>,           )
                                )
          Defendants.           )
_____)

<u>MEMORANDUM OPINION AND ORDER</u>

Plaintiffs Han Kim ("Han") and Yong Seok Kim ("Yong") bring this civil action under the terrorism exception of the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605A(c), seeking damages against officials, employees and agents of defendant Democratic People's Republic of Korea ("DPRK") in connection with the January 16, 2000 abduction of Reverend Kim Dong Shik ("Reverend Kim"), who is Han's father and Yong's brother. Following his abduction, Reverend Kim was forcibly transferred to North Korea where the plaintiffs allege he was repeatedly tortured by officials, employees and agents of DPRK.

Plaintiffs filed suit and served DPRK following the requirements of 28 U.S.C. § 1608(a)-(b). DPRK failed to answer or otherwise respond to the complaint, and plaintiffs secured entry of default under Fed. R. Civ. P. 55(a). The plaintiffs then moved for default judgment and have submitted proposed

- 2 -

findings of fact, along with supporting declarations and
documentary evidence, and proposed conclusions of law.

The FSIA permits courts to exercise subject matter
jurisdiction and enter judgments of liability against foreign
states only where a plaintiff pleads and produces satisfactory
evidence that a foreign state's conduct falls within one of the
enumerated exceptions to sovereign immunity.  28 U.S.C.
§ 1605A(a), (c).  The plaintiffs here rely on the exception for
torture, arguing that "[t]he evidence submitted demonstrates that
it is far more likely than not that Reverend Kim suffered and
continues to suffer the torture and brutal conditions meted out
to all 'enemies' of the DPRK unfortunate enough to fall into the
hands of the DPRK's security services."  Pls.' Proposed Findings
of Facts and Conclusions of Law ("Pls.' Proposed Facts") at 42.
However, plaintiffs' evidence regarding DPRK's alleged treatment
of Reverend Kim appears insufficient to meet the high standard
recognized in this circuit that is set by the FSIA's definition
of torture.  Because the FSIA precludes jurisdiction over this
action against a foreign sovereign for conduct not shown by
satisfactory evidence to meet the high standard set for proof of
torture, the plaintiffs' motion for default judgment will be
denied but the case will be certified for an interlocutory
appeal.

<u>DISCUSSION</u>

I.   JURISDICTION AND LIABILITY UNDER THE FSIA

Before Congress amended the FSIA in 2008 to add the
§ 1605A(c) private right of action, the D.C. Circuit explained
that at base, "[t]he FSIA is undoubtedly a jurisdictional statute
which, in specified cases, eliminates foreign sovereign immunity
and opens the door to subject matter jurisdiction in the federal
courts." <u>Price v. Socialist People's Libyan Arab Jamahiriya</u>, 294
F.3d 82, 87 (D.C. Cir. 2002); <u>see also</u> <u>Maritime Int'l Nominees</u>
<u>Establishment v. Republic of Guinea</u>, 693 F.2d 1094, 1099 (D.C.
Cir. 1982) ("[T]he absence of immunity is a condition to the
presence of subject matter jurisdiction."). The door is opened
only for cases that fall into one of the statute's specifically
enumerated exceptions. Here, Han and Yong rely on the exception
eliminating foreign sovereign immunity in cases "in which money
damages are sought against a foreign state for personal injury or
death that was caused by an act of torture, [or] extrajudicial
killing, . . . if such act . . . is engaged in by an official,
employee, or agent of such foreign state while acting within the
scope of his or her office, employment, or agency." 28 U.S.C.
§ 1605A(a)(1). The FSIA imposes the additional jurisdictional
requirements that the foreign state have been designated as a
state sponsor of terrorism during a specified period, that the
claimant or victim have been a United States national at the time

- 4 -

of the torture, and that the foreign state have been afforded a
reasonable opportunity to arbitrate the claim.  28 U.S.C.
§ 1605A(a)(2).  Section 1605A(c) provides the private right of
action for a U.S. citizen against such a foreign state for
personal injury or death caused by an act of torture engaged in
by the foreign state's officials acting in their official
capacity.  28 U.S.C. § 1605A(c).  In actions under this
provision, "a foreign state shall be vicariously liable for the
acts of its officers, employees, or agents."  Id.

   Because plaintiffs must allege the elements of a claim under
§ 1605A(c) in order to meet the requirements for waiver of
foreign sovereign immunity, liability will exist whenever the
jurisdictional requirements of § 1605A(a) are proven.  See
Kilburn v. Islamic Republic of Iran, 699 F. Supp. 2d 136, 155
(D.D.C. 2010) ("[T]he § 1605A(c) cause of action is fulfilled by
demonstrating that the foreign sovereign performed acts described
in subsection (a)(1) of § 1605A, which addresses immunity and
subject matter jurisdiction. . . .  Although an analysis of a
foreign sovereign's potential immunity and liability should be
conducted separately, the elements of immunity and liability
under § 1605A(c) are essentially the same in that § 1605A(a)(1)
must be fulfilled to demonstrate that a plaintiff has a cause of
action."); see also Gates v. Syrian Arab Republic, 580 F. Supp.
2d 53, 64-69 (D.D.C. 2008) (explaining that § 1605A(c) provides a

- 5 -

private right of action where subject matter jurisdiction exists
under § 1605A(a)).

The FSIA adopts the definition of torture contained in
section 3 of the Torture Victims Protection Act ("TVPA").  28
U.S.C. § 1605A(h)(7) (citing 28 U.S.C. § 1350 note).  The TVPA
defines torture as

> any act, directed against an individual in the
> offender's custody or physical control, by which severe
> pain or suffering (other than pain or suffering arising
> only from or inherent in, or incidental to, lawful
> sanctions), whether physical or mental, is
> intentionally inflicted on that individual for such
> purposes as obtaining from that individual or a third
> person information or a confession, punishing that
> individual for an act that individual or a third person
> has committed or is suspected of having committed,
> intimidating or coercing that individual or a third
> person, or for any reason based on discrimination of
> any kind.

TVPA, Pub. L. No. 102-256, § 3(b)(1), 106 Stat. 73, 73 (1992).

The amended complaint also alleges that Reverend Kim was
"tortured to death by officers, employees and agents of defendant
North Korea[,]" Am. Compl. ¶ 27, and that Reverend Kim's "murder"
thus qualifies under 28 U.S.C. § 1605A as an extrajudicial
killing, id. ¶ 33.  The FSIA adopts the definition of
extrajudicial killing contained in the TVPA: "a deliberated
killing not authorized by a previous judgment pronounced by a
regularly constituted court affording all the judicial guarantees
which are recognized as indispensable by civilized peoples."
TVPA, Pub. L. No. 102-256, § 3(a), 106 Stat. 73, 73 (1992).

- 6 -

Courts have found that extrajudicial killing occurs, for example, where a defendant deliberately kills individuals by a targeted or deliberate bombing, <u>see, e.g.</u>, <u>Owens v. Republic of Sudan</u>, 826 F. Supp. 2d 128, 150 (D.D.C. 2011); <u>Valore v. Islamic Republic of Iran</u>, 700 F. Supp. 2d 52, 74 (D.D.C. 2010), or deliberately assassinates or executes an individual, <u>see</u> <u>Oveissi v. Islamic Republic of Iran</u>, 573 F.3d 835, 839-40 (D.C. Cir. 2009); <u>Kilburn</u>, 699 F. Supp. 2d at 152-53; <u>Bakhtiar v. Islamic Republic of Iran</u>, 571 F. Supp. 2d 27, 34 (D.D.C. 2008).  Here, plaintiffs have not alleged a targeted bombing or a deliberate execution.  Instead, by alleging that Reverend Kim was tortured to death and that this murder qualifies as an extrajudicial killing, the plaintiffs must show that North Korean agents deliberately killed Reverend Kim by torturing him.  Thus, the plaintiffs' extrajudicial killing claim relies squarely upon an adequate showing that Reverend Kim was tortured.

    The D.C. Circuit has emphasized the high standard that the statutory definition of torture imposes.  In <u>Price</u>, an interlocutory appeal of a district court order rejecting Libya's claim of sovereign immunity in its motion to dismiss, the court of appeals considered the sufficiency of the complaint's allegations of torture.  The circuit's reasoning merits recounting in some detail:

- 7 -

The severity requirement is crucial to ensuring that
the conduct proscribed by the Convention and the TVPA
is sufficiently extreme and outrageous to warrant the
universal condemnation that the term 'torture' both
connotes and invokes . . . . [O]nly acts of a certain
gravity shall be considered to constitute torture
. . . . The term 'torture,' . . . is usually reserved
for extreme, deliberate and unusually cruel practices,
for example, sustained systematic beating, application
of electric currents to sensitive parts of the body,
and tying up or hanging in positions that cause extreme
pain . . . . The critical issue is the degree of pain
and suffering that the alleged torturer intended to,
and actually did, inflict upon the victim.  The more
intense, lasting, or heinous the agony, the more likely
it is to be torture . . . . [I]n order to constitute
torture, an act must be a deliberate and calculated act
of an extremely cruel and inhuman nature, specifically
intended to inflict excruciating and agonizing physical
or mental pain or suffering . . . . [T]orture does not
automatically result whenever individuals in official
custody are subjected even to direct physical assault.
Not all police brutality, not every instance of
excessive force used against prisoners, is torture
under the FSIA . . . . [I]t is especially important
for the courts to ensure that foreign states are not
stripped of their sovereign immunity unless they have
been charged with actual torture, and not mere police
brutality.

Price, 294 F.3d at 92-93 (internal quotations and citations

omitted).  In addition, for abuse to constitute torture it must

be inflicted intentionally, not merely incidentally.  Id. at 93

("In order to lose its sovereign immunity, a foreign state must

impose suffering cruelly and deliberately, rather than as the

unforeseen or unavoidable incident of some legitimate end.").

    In light of this meaning, the court found insufficient to

waive sovereign immunity allegations that plaintiffs were held

- 8 -

for approximately three months in a political prison where they
allegedly "endured deplorable conditions while incarcerated,
including urine-soaked mattresses, a cramped cell with
substandard plumbing that they were forced to share with seven
other inmates, a lack of medical care, and inadequate food," and
further "were kicked, clubbed and beaten by prison guards, and
interrogated and subjected to physical, mental and verbal abuse."
Id. at 86 (internal quotations omitted).  The Price court further
found the complaint inadequate because it "says virtually nothing
about the purpose of the alleged torture."  Id. at 94; see also
Simpson v. Socialist People's Libyan Arab Jamahiriya, 326 F.3d
230, 234 (D.C. Cir. 2003) (finding allegations of forcibly
removing passenger from cruise ship, holding passenger
incommunicado and threatening her with death if she moved from
her quarters did not rise to the level of torture under the FSIA
and state a claim).

    Price considered the sufficiency of torture allegations when
the defendants moved to dismiss the complaint for lack of subject
matter jurisdiction.  Price's reasoning is equally instructive
for determining whether a plaintiff in a default proceeding has
established subject matter jurisdiction.  When a court reviews
unchallenged factual allegations on a motion to dismiss, the
allegations are assumed to be true for purposes of assessing

- 9 -

subject matter jurisdiction.  Price, 294 F.3d at 93.  Similarly,

for the purposes of examining subject matter jurisdiction on a

motion for entry of default under the FSIA, courts accept the

plaintiffs' factual allegations as true.  Sisso v. Islamic

Republic of Iran, 448 F. Supp. 2d 76, 81 & n.5 (D.D.C. 2006)

(reasoning on motion for entry of default in FSIA proceeding that

court was "preclude[d] . . . *at this stage of the litigation* from

making factual findings that are inconsistent with the

allegations of the complaint" and explicitly accepted "all of

plaintiffs' factual allegations as true[.]").  However, to

establish subject matter jurisdiction, the allegations must be

sufficiently detailed.  At the pleadings stage, the Price court

accordingly found inadequate the allegations before it, holding

that

> plaintiffs' complaint offers no useful details about
> the nature of the kicking, clubbing, and beatings that
> plaintiffs allegedly suffered.  As a result, there is
> no way to determine from the present complaint the
> severity of plaintiffs' alleged beatings -- including
> their frequency, duration, the parts of the body at
> which they were aimed, and the weapons used to carry
> them out -- in order to ensure that they satisfy the
> TVPA's rigorous definition of torture.

Price, 294 F.3d at 93.  Beyond the pleadings stage, plaintiffs

"have to prove the merits of their claims before they can obtain

a default *judgment*" and "the evidence they present will have to

provide support" for the theories of liability they allege.

- 10 -

<u>Sisso</u>, 448 F. Supp. 2d at 79 n.2.  It follows that plaintiffs must provide sufficiently detailed proof of their allegations that DPRK agents tortured Reverend Kim in order to ensure that the conduct "satisf[ies] the TVPA's rigorous definition of torture."  <u>Price</u>, 294 F.3d at 93.

II.  STANDARDS FOR DEFAULT JUDGMENT

Default judgment against a foreign state shall be entered only where a plaintiff "establishes his claim or right to relief by evidence that is satisfactory to the Court."  28 U.S.C. § 1608(e).  The "satisfactory to the court" standard is identical to the standard for entering default judgment against the United States under Fed. R. Civ. P. 55(d) (requiring claimant to "establish[] a claim or right to relief by evidence that satisfies the court").  <u>Hill v. Republic of Iraq</u>, 328 F.3d 680, 683 (D.C. Cir. 2003) (citing H.R. Rep. No. 94-1487, at 26 (1976)).  Neither standard, however, is easily defined.  <u>See</u> <u>Smith ex rel. Smith v. Islamic Emirate of Afghanistan</u>, 262 F. Supp. 2d 217, 223 (S.D.N.Y. 2003) (observing that "[t]he issue appears to have defied definitive resolution largely because in most cases the evidence of the defaulting defendant's liability is quite compelling and thus the matter can be decided without a more concise meaning of 'evidence satisfactory to the court'").  The D.C. Circuit has not addressed the question, and lower courts

have articulated varying rationales for what quantum of evidence is "satisfactory."

Some courts in FSIA default proceedings have found to be "satisfactory" evidence that they described as "clear and convincing." See, e.g., Weinstein v. Islamic Republic of Iran, 184 F. Supp. 2d 13, 16 (D.D.C. 2002) (finding jurisdictional facts "established by clear and convincing evidence, which would have been sufficient to establish a prima facie case in a contested proceeding"); Mousa v. Islamic Republic of Iran, 238 F. Supp. 2d 1, 3 (D.D.C. 2001) (same). But the reasoning of these cases suggests strongly -- and in some cases indicates explicitly -- that clear and convincing evidence was considered a sufficient, rather than a necessary, quantum of proof. See, e.g., Campuzano v. Islamic Republic of Iran, 281 F. Supp. 2d 258, 269 (D.D.C. 2003) (concluding that "the plaintiffs have gone beyond the necessary burden of 'evidence satisfactory to the court' and have proven each element by clear and convincing evidence").

Other courts have drawn an analogy between the FSIA default standard and that for judgment as a matter of law, either after a jury trial or on summary judgment. One court held that the FSIA default standard "call[s] for proof by evidence of a nature and quality sufficient to support summary judgment under Fed. R. Civ.

- 12 -

P. 56, namely, oral or written testimony under oath, made upon personal knowledge by witnesses competent to testify to the matters stated therein." <u>Hill v. Republic of Iraq</u>, 175 F. Supp. 2d 36, 38 n.4 (D.D.C. 2001) (referring to then-current Rule 56(e)).[1]  In <u>Ungar v. Islamic Republic of Iran</u>, 211 F. Supp. 2d 91, 98 (D.D.C. 2002), the court considered the <u>Hill</u> standard, among others, but then purported to opt for the standard for judgment as a matter of law after a jury trial, set forth in Federal Rule of Civil Procedure 50(a), which the court described as "a legally sufficient evidentiary basis for a reasonable jury to find for plaintiff." <u>Id.</u> at 98.[2]  Several subsequent courts, <u>see, e.g.</u>, <u>Gates</u>, 580 F. Supp. 2d at 63, have adopted as the

---

[1] This case was reversed in part by <u>Hill v. Republic of Iraq</u>, 328 F.3d 680 (D.C. Cir. 2003).  The D.C. Circuit rejected the burden of proof on damages for default judgment that the district court articulated, but "did not address the question of the FSIA's plaintiff's burden on proof on liability." <u>Hill</u>, 328 F.3d at 683-84.

[2] The Federal Rule of Civil Procedure 50(a) standard is more stringent than the <u>Ungar</u> court's formulation suggests.  Judgment as a matter of law against a party may be granted only if "the court finds that a reasonable jury would *not* have a legally sufficient evidentiary basis to find for the party on [an] issue." Fed. R. Civ. P. 50(a); <u>see also</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250 (1986) (holding that the summary judgment standard "mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict").  In this light, the standards actually applied in <u>Hill</u> and <u>Ungar</u> are virtually identical.

standard that the plaintiffs must put forth a "legally sufficient *prima facie* case." See, e.g., Kilburn, 699 F. Supp. 2d at 150.

Interpreting the "satisfactory to the court" standard to require a legally sufficient *prima facie* case best accounts for the posture of default proceedings under the FSIA.  Where the defendant has not participated in the proceedings and there has been no opportunity for discovery, plaintiffs cannot be expected to meet a typical standard for judgment as a matter of law. However, the plaintiff's evidence must be rigorous enough to support the facts necessary for jurisdiction.

In FSIA default proceedings, "the court may accept as true the plaintiffs' uncontroverted evidence." Wachsman v. Islamic Republic of Iran, 603 F. Supp. 2d 148, 155 (D.D.C. 2009) (internal quotations omitted) (quoting Elahi v. Islamic Republic of Iran, 124 F. Supp. 2d 97, 100 (D.D.C. 2000)); see also Gates, 580 F. Supp. 2d at 63 (same); Alejandre v. Republic of Cuba, 996 F. Supp. 1239, 1243 (S.D. Fla. 1997) (same).  The evidence provided, however, is subject to the Federal Rules of Evidence. See, e.g., Daliberti v. Republic of Iraq, 146 F. Supp. 2d at 21 n.1 (D.D.C. 2001) (noting that "[i]n the absence of defense counsel, the Court used particular care to draw the . . . findings of fact and conclusions of law from admissible testimony in accordance with the Federal Rules of Evidence").  Hearsay

- 14 -

evidence therefore is normally inadmissible because it lacks
sufficient indicia of reliability.  Expert witnesses, however,
may rely on hearsay evidence to reach their conclusions.  Fed. R.
Evid. 703.  Plaintiffs may present their evidence in the form of
affidavits or declarations, <u>see</u> <u>Campuzano</u>, 281 F. Supp. 2d at 268
(citing <u>Weinstein</u>, 184 F. Supp. 2d at 19), and an evidentiary
hearing is not required before a default judgment against a
foreign state is entered.  <u>See</u> <u>Ben-Rafael v. Islamic Republic of
Iran</u>, 540 F. Supp. 2d 39, 43 (D.D.C. 2008).

III. PLAINTIFFS' EVIDENCE

    Plaintiffs have submitted their own declarations, as well as
declarations from family member Dani Butler, and from multiple
experts on North Korea.  Exhibits include congressional
resolutions relating to Reverend Kim's abduction, and press
materials, book excerpts and reports from human rights
organizations and the U.S. State Department about North Korea.
The plaintiffs rely in particular on the decision of a South
Korean court that tried and convicted a DPRK intelligence agent
for crimes including the abduction of Reverend Kim.  Plaintiffs
have provided a sworn English translation of that decision.  <u>See</u>
Declaration of J.D. Kim (certifying translation of Decision of
Seoul Joong Ang Ji Bang Court, Criminal Part 23 ("South Korean
court decision")).  The judgment of the South Korean court is a

proper subject of judicial notice under Federal Rule of Evidence
201 to establish the fact of foreign litigation and the resulting
actions of the foreign court.  Fed. R. Evid. 201 (permitting
judicial notice of a fact that is not subject to reasonable
dispute because it can be accurately and readily determined from
sources whose accuracy cannot reasonably be questioned); see,
e.g., Jordan (Bermuda) Inv. Co., Ltd. v. Hunter Green Invs. Ltd.,
154 F. Supp. 2d 682, 689 (S.D.N.Y. 2001) (taking judicial notice
of foreign court judgment); Luxpro Corp. v. Apple Inc., No. C 10-
03058 JSW, 2011 WL 1086027, at *3 (N.D. Cal. March 24, 2011)
(same).  A declaration certifying under penalty of perjury that
the translation of the decision is true and correct accompanies
the decision and suffices to establish its accuracy.  See 28
U.S.C. § 1746.  Recited below, without an attempt to parse the
admissibility of all of it, is the evidence presented by the
plaintiffs.

North Korean refugees who were able to escape to China
would stay in secret safe-houses that non-governmental
organizations and religious humanitarian groups had established
or that Chinese locals in the area with ethnic Korean descent
would support.  Report of Yoshikuni Yamamoto ("Yamamoto Decl.")
¶ 17.  In response, the DPRK established a network of local
agents in China under DPRK's security services to abduct

defectors and the humanitarian workers who assisted them.  Id.
¶¶ 18, 23.  On September 17, 2002, DPRK leader Kim Jong-Il
admitted publicly to Prime Minister Koizumi of Japan that DPRK
security services had engaged in kidnapping Japanese citizens
between 1977 and 1983.  Declaration of Ernest C. Downs ("Downs
Decl.") ¶ 20.

In 1993, Reverend Kim moved to China to work as a missionary
providing humanitarian and religious services to the families of
North Korean defectors and refugees who had fled across the Sino-
Korean border seeking asylum.  Yamamoto Decl. ¶ 20.  He had
previously worked with the Special Olympics in China and worked
to raise money for medical supplies for needy children.  He
learned of the plight of North Korean refugees and at once
committed himself to aid this disadvantaged community.
Declaration of Han Kim ("Han Decl.") ¶¶ 19, 21.  Reverend Kim set
up numerous refugee shelters and a school for expatriate North
Korean children and handicapped persons in the Chinese town of
Yanji.  He named the school the "School of Love."  Yamamoto Decl.
¶ 20.

DPRK intelligence agent Hua was convicted on April 21, 2005
by a South Korean Court in Seoul, for his involvement in planning
and executing various abductions of civilians from China to North
Korea following the instructions of a senior DPRK intelligence

- 17 -

official.  South Korean court decision at 1.  One of the crimes

for which Hua was convicted was his direct involvement in

planning and carrying out the abduction of Reverend Kim.  Id. at

2.  Hua was sentenced to ten years imprisonment.  Id. at 1.  The

plaintiffs allege that agents prosecuted for abducting Reverend

Kim provided information concerning Reverend Kim's torture in

North Korea, and cite to the South Korean court decision for

support.  Pls.' Proposed Facts at 8; Revised Proposed Findings of

Facts and Conclusions of Law at 18.  However, the court decision

makes no reference to Reverend Kim being tortured in North Korea.

Members of the United States Congress have investigated the

DPRK policy of abducting foreigners and have issued various

resolutions regarding the issue.  On June 11, 2002, the House of

Representatives issued a resolution urging the governments of the

United States, South Korea and China to seek a full accounting

from the DPRK regarding the whereabouts of Reverend Kim.  Downs

Decl. ¶ 25, Ex. A.  On July 11, 2005, the House of

Representatives issued a resolution condemning the DPRK's use of

abductions and demanding the return of individuals being held in

North Korea.  Id. ¶ 25, Ex. C.  On January 28, 2005, an Illinois

congressional delegation, including then-United States Senator

Barack Obama, sent a letter to North Korean Ambassador to the

United Nations Pak Gil Yon, which specifically asked that North

- 18 -

Korea forthwith investigate the circumstances of Reverend Kim's abduction and fate, and which stated that its signatories would not support the removal of the DPRK from the State Department's list of State Sponsors of Terrorism until the whereabouts of Reverend Kim had been made known.  Id. ¶ 25, Ex. E.  This letter was followed by a letter from Representative Henry Hyde in his capacity as the Chairman of the House Committee on International Relations, dated November 4, 2005, after the Illinois congressional delegation had returned from a trip to Japan.  Id. ¶ 25, Ex. F.

A recently declassified internal State Department cable dated February 3, 2000, from representatives stationed in Seoul communicating with headquarters in Washington, D.C., states that a local Chinese paper reported that Chinese investigators had "strong evidence" that Reverend Kim was kidnapped from China by DPRK agents who had crossed over into China in late December to plan the abduction.  Id. ¶ 26, Ex. G.  The cable -- authored a mere two weeks after Reverend Kim's abduction -- further reported that ten people were involved in Reverend Kim's kidnapping, including a couple posing as North Korean defectors, and that Reverend Kim was held hostage in China before being transported into North Korea by his captors.  Id.  The State Department's 2003 country report on North Korea discusses North Korea's

responsibility for disappearances and refers to "unconfirmed reports that in January 2000 North Korean agents kidnaped a South Korean citizen, Reverend Kim Dong Shik, in China and took him to North Korea." Decl. of Robert Tolchin, Dkt. No. 37 at 3. The State Department also recounts that North Korea engaged in torture including "severe beatings, electric shock, prolonged periods of exposure, humiliations such as public nakedness, and confinement to small 'punishment cells[.]" Id. at 4. The report describes harsh prison conditions in North Korea where "starvation and executions were common" and former prisoners reported severe beatings and "torture involving water forced into a victim's stomach with a rubber hose and pumped out by guards jumping on a board placed across the victim's abdomen[.]" Id. A 2009 State Department country report on human rights practices in the DPRK states that the North Korean government was responsible for disappearances and that "[i]n 2008 the media reported South Korean missionary Kim Dong-shik had most likely died within a year of his 2000 disappearance near the China-DPRK border." Decl. of Robert Tolchin, Dkt. No. 38 at 3. The 2009 report reiterates the reported torture methods and the harsh conditions of the prisons in North Korea. Id. at 3-4. However, the State Department cable and reports do not provide any first-hand accounts of Reverend Kim's treatment, or address the nature or

- 20 -

severity of any torture Reverend Kim suffered, or specify the
frequency or duration of the acts of torture or the parts of the
body at which they were aimed or any weapons used to carry them
out.

Expert research on human rights abuses in North Korea has
reported widespread and systematic repression by DPRK operatives
of DPRK citizens and foreign nationals, specifically by means of
forced abductions and confinement in *kwan-li-so*, or political
penal-labor colonies.  The reports are based on first-hand
accounts and satellite photography, among other data.
Declaration of Professor David Hawk ("Hawk Decl.") ¶¶ 8-13.
Professor David Hawk has expertise in human rights in North
Korea, has published extensively on that issue, and has
interviewed scores of former prisoners with first-hand accounts
of treatment in North Korean camps.  He declared that prisoners
of the penal colonies face harsh conditions and treatment,
including below-subsistence food rations, back-breaking forced
physical labor, brutal beatings, long-term solitary confinement,
rape, and forced abortion.  Id. ¶¶ 14-19.  Prisoners are forced
to perform labor twelve or more hours a day, seven days a week,
and receive only enough food to be kept on the verge of
starvation.  Id. ¶ 14.  Prisoners often endure "long-term
solitary confinement in punishment cells which do not have enough

space for a person to completely lie down or stand up, causing

inmates to experience a loss of circulation and atrophy of legs,

and often leading to death within several weeks." <u>Id.</u> ¶ 15.

According to Hawk, "[a]ttempted escapees are automatically

executed and other 'major' rule-breakers are publicly executed by

hanging or firing squad in front of the assembled prisoners of

that section of the camp." <u>Id.</u> "Many inmates cannot withstand

the harsh conditions of their imprisonment and a significant

number die within a year of their arrival to the kwan-li-so. A

large number of those who survive develop permanent disabilities

-- signs of premature aging, hunchbacks and other physical

deformities due to the brutal work conditions and cell sizes."

<u>Id.</u> ¶ 16. Hawk stated that a defining characteristic of DPRK's

political penal-labor colonies is that "prisoners are not

formally arrested, charged (or even told of their offense), or

tried in any sort of judicial procedure." <u>Id.</u> ¶ 11.

Hawk said

> [w]hile I do not have any firsthand knowledge about
> Reverend Kim's case specifically, given my extensive
> experience with the DPRK and the manner in which
> abductees repatriated from China were usually treated,
> it is likely that [Reverend Kim] would have been
> initially held in a *ku-ryu-jang*, or a DPRK police
> detention and interrogation facility, before being
> transferred to a *kwan-li-so*. It also seems likely to
> me that Reverend Kim, at a minimum, would have been
> subjected to the harsh treatment afforded to all of its
> prisoners. But because Reverend Kim was such a
> valuable target of the DPRK and so much planning,

> effort and other resources had gone into his abduction,
> it is clear to me that Reverend Kim was subjected to
> additional brutality.

Id. ¶ 20.  Reports and concerns about Reverend Kim's treatment

have circulated widely enough that he would have been more likely

to be viewed by the DPRK as a high-value target warranting harsh

treatment.  Id.  Hawk "believe[s] that the various reports of

[Reverend Kim's] torture and eventual starvation, from the

accounts of other prisoners, are likely to be reliable and

accurately describe how Reverend Kim was treated by his captors

from the time he was abducted and incarcerated until his untimely

death."  Id.  Hawk does not detail from the reports the nature or

severity of the torture Reverend Kim suffered, or the frequency

or duration of the acts of torture or the parts of the body at

which they were aimed or any weapons used to carry them out.

Ernest C. Downs, a former senior official of the U.S.

Department of Defense who served from 2001 to 2008 on the board

of the United States Committee for Human Rights in North Korea,

stated that it is "clear . . . that [Reverend Kim] was abducted

by DPRK agents from China and forcibly brought to North Korea[.]"

Downs Decl. ¶ 33.  According to Downs, DPRK agents have

specifically abducted and imprisoned people who have assisted

North Korean defectors as well as Christian missionaries.

Supplemental Declaration of Ernest C. Downs ("Downs Supp. Decl.")

¶ 6(b)-(d).  Because Reverend Kim assisted North Korean defectors
and was a Christian missionary, he was likely a "valuable and
important target to the government and ruling party of the DPRK."
Id. ¶ 6(a)-(c).  Based on the testimony of other North Korean
prisoners, Downs states that prisoners are forced to labor for
more than twelve hours per day, sometimes sixteen hours, and the
failure to meet production quotas leads to "additional hard
labor, less food, and exceptionally painful physical punishment."
Downs Decl. ¶ 11; see also Downs Supp. Decl. ¶ 11.  Thus,
"[p]risoners in North Korea's political prisons do not often
survive."  Downs Supp. Decl. ¶ 7.  Downs states that he is aware
of the testimony of 1000 former North Korean prisoners and Downs
"does not know of any case in which the former prisoner was not
subjected to torture while in the prison camp."  Downs Supp.
Decl. ¶ 10.  Downs provides numerous examples from former
prisoners describing inmate mistreatment in DPRK prisons and
facilities.  In particular, Downs submits an excerpt from Hawk's
book The Hidden Gulag which recounts inmates who were subject to
burnings, skin piercing, water torture, being hung by wrists or
upside-down, sleep deprivation, food deprivation, facial and shin
beatings with rifle butts, whippings with belts, beatings in the
legs with a wooden stave, undersized punishment cells where
detainees could not stand up or lie down and placement in

- 24 -

punishment cells for a week or more.  <u>Id.</u>, Ex. 1 at 148-52.
Downs also attaches an account of a prisoner who was hung by his
hands and feet, stabbed in the lower abdomen and held over a fire
until he lost consciousness.  <u>Id.</u>, Ex. 2 at 57-58.

Downs also opines that "Reverend Kim's killing was motivated
by political considerations."  Downs Decl. ¶ 7.  In his opinion,
"a foreigner abducted by the DPRK for political purposes, such as
Reverend Kim, after eleven years would still either be
languishing in a North Korea prison camp or would have already
been killed."  <u>Id.</u> ¶ 34.  He "believe[s] that credible
information on [Reverend Kim's] treatment in North Korea has been
obtained from defectors."  <u>Id.</u>  He states that Reverend Kim
probably was subjected to "severe beatings while in stress
positions (such as while suspended from the ceiling), near
starvation, and forced physical exertion to the point of absolute
physical exhaustion."  Downs Supp. Decl. ¶ 9.  In addition, Downs
asserts that he is certain that "Reverend Kim has been subject to
exceptionally painful, brutal, and outrageous treatment while in
prison."  <u>Id.</u> ¶ 8.  Downs also states that "[c]redible sources
have reported that Reverend Kim died as a result of his torture
and malnutrition."  <u>Id.</u> ¶ 6(i).  Thus, Downs concludes that
Reverend Kim's "death resulted from torture and malnutrition
deliberately caused by his North Korean captors."  <u>Id.</u> ¶ 13.

Downs neither identifies the former prisoners, the defectors or other credible sources for these conclusions, nor reveals their basis of knowledge about Reverend Kim, nor says he has spoken with any of them.  Downs does not provide details from the credible information received concerning the severity of Reverend Kim's beatings, such as their frequency, duration, the parts of the body at which they were aimed, or the weapons used to carry them out.

Do Hee-Youn, a member of a South Korea-based human rights organization, heard "through the information net" that Reverend Kim died in North Korea as a result of torture and malnutrition in February 2001.  Declaration of Do Hee-Youn ("Do Hee-Youn Decl.") ¶ 13.  Yoshikuni Yamamoto, a researcher at a human rights organization in Washington, DC, stated generally that "it was reported" that Reverend Kim was tortured after refusing to collaborate and that he died in February 2001 and was buried in District 91 military training base in Sangwon-ri near Pyongyang. Yamamoto Decl. ¶ 22.  Neither declaration supplied details about the nature of the reported torture.

Human Rights Watch released a 2007 report discussing the mistreatment of prisoners at detention facilities in North Korea. This report states that

> prisoners are subject to strip searches, verbal abuse
> and threats, beatings, forced labor, and lack of food

- 26 -

> and medicine, among other abuses.  Torture and other
> cruel and inhuman treatment appears widespread and can
> occur throughout the process of incarceration in North
> Korea[.]

North Korea: Harsher Policies against Border-Crossers, Dkt. No.

35-1 at 8.  In particular, the report includes accounts from

former prisoners who state that the guards

> would make [prisoners] sit down and stand up repeatedly
> until [they] collapsed, or forced [them] to hang onto
> cell bars or bang [their] heads onto cell bars. . . .
> Guards beat people all the time –- they used sticks or
> belts.  They also slapped or kicked inmates for
> disobedience.

Id.  Similarly, the United Nations Special Rapporteur on the

situation of human rights in the DPRK released a report which

described what it called DPRK's record of torture and inhuman

treatment, arbitrary detention and use of prison camps.  Pls.'

Supp. Submission of New Auth., Ex. 1, Human Rights Council, Rep.

of the Special Rapporteur on the situation of human rights in the

DPRK, 22d Sess., U.N. Doc. A/HRC/22/57 (Feb. 1, 2013).  This

report stated that, in 2007, there were reports that DPRK

authorities engaged in "torture, public executions, and

persecution of political dissidents."  Id., Annex 1 ¶ 22.  In

2008, the Secretary-General stated that reports from DPRK

"continue to indicate trends of torture, inhumane conditions of

detention, public execution, ill-treatment of refugees" and the

Special Rapporteur stated that

- 27 -

> the harsh conditions imposed by the criminal justice
> system and related detention give rise to a plethora of
> abuses, including torture and cruel, inhuman and
> degrading treatment.  The abuses are ubiquitous, and
> include degrading treatment of deceased persons.

Id., Annex 1 ¶ 23.  The UN Special Rapporteur cites 2011 reports which state that DPRK correctional officers beat inmates and that torture was occurring at various camps in the DPRK.  Id., Annex 1 ¶¶ 25-26.  In addition, "[t]he Secretary-General noted in 2012 that some reports also indicate the existence of prison camps where torture and execution are widespread."  Id., Annex 1 ¶ 27. The report identifies the political labor camps and states that the Special Rapporteur has consistently expressed concern about "unreasonable and abusive punishments" and "torture and detention without due process of law" and the "harsh conditions" in the camps where "no clothing is provided" and inmates are "expected to work long hours performing manual labour."  Id., Annex 1 ¶¶ 48-51, 54.  Neither report provides any first-hand knowledge of Reverend Kim's mistreatment.  The reports do not detail the frequency or duration of the acts of torture at the DPRK prison camps.

Plaintiffs cite an excerpt from Melanie Kirkpatrick's 2012 book Escape from North Korea that states that Reverend Kim was tortured and murdered by the North Koreans.  Pls.' Supp. Submission of New Authority, Dkt. No. 55, Ex. 1 at 150-51.  The

- 28 -

excerpt states that Reverend Kim was transported to a political prison camp and "[h]e appears to have been beaten and starved to death after refusing to renounce his religion." Id. at 152. Kirkpatrick also states that "according to [Reverend Kim's] family, his remains are believed to be in People's Army Camp 91, a garrison on the outskirts of Pyongyang." Id. (footnote omitted). Kirkpatrick reports as the source for these details the plaintiffs' amended complaint and the filings docketed in this case. See Melanie Kirkpatrick, Escape from North Korea 329 n.20 (2012). In any event, the Kirkpatrick excerpt does not detail the nature or severity of the torture, or the frequency or duration of the acts of torture or the parts of the body at which they were aimed or any weapons used to carry them out.

IV.  JURISDICTION IN THIS CASE

Section 1605A(a)(2)(A)(i)(I) provides in relevant part that a court shall hear a claim under § 1605A against a foreign state if that state "was designated as a state sponsor of terrorism at the time the [torture or extrajudicial killing] occurred, . . . and . . . either remains so designated when the claim is filed under this section or was so designated within the 6-month period before the claim is filed under this section[.]"  North Korea was designated as a state sponsor of terrorism in 1988. See Notice, Determination Pursuant to Section 6(j) of the Export

Administration Act of 1979; North Korea, 53 Fed. Reg. 3477-01
(Feb. 5, 1988).  North Korea's designation was rescinded on
October 11, 2008.  <u>See</u> Notice, Rescission of Determination
Regarding North Korea, 73 Fed. Reg. 63540-01 (Oct. 24, 2008).
Thus, North Korea remained designated as a state sponsor of
terrorism within the 6-month period before this action was filed
on April 8, 2009.

Section 1605A(a)(2)(A)(ii)(I) further requires that "the
claimant or the victim was, at the time the act . . . occurred
. . . a national of the United States."  An individual deemed to
owe a permanent allegiance to the United States and who actively
pursues U.S. citizenship can be held to be a "national of the
United States" in satisfaction of § 1605A(a)(2)(A)(ii)(I).  <u>See,
e.g.</u>, <u>Saludes v. Republica de Cuba</u>, 577 F. Supp. 2d 1243, 1252
(S.D. Fla. 2008).  At the time of Reverend Kim's abduction,
plaintiff Yong Kim was a U.S. citizen and plaintiff Han Kim can
be deemed to have been a U.S. national.  He had lived in the U.S.
since 1992 and became a Permanent Resident owing a permanent
allegiance to the U.S.  In 1999, before his father's abduction,
he began the application process to become a naturalized American
citizen with the intention of remaining in this country.
Supplemental Declaration of Han Kim at 1-2.

- 30 -

For any "production of pain" to constitute torture under the TVPA definition, the act must be "purposive, and not merely haphazard . . . [or] the unforeseen or unavoidable incident of some legitimate end." Price, 294 F.3d at 93.  Plaintiffs' proffered evidence includes expert opinions, a type of evidence that courts have credited in FSIA default actions.  See Kilburn, 699 F. Supp. 2d at 143, 152.  Hawk asserts that DPRK's policy is to imprison "political prisoners and others deemed to be opponents of the DPRK regime" to "deter dissent in the larger population[.]"  Hawk Decl. ¶ 10.  Hawk and Downs state that Reverend Kim was targeted by DPRK because of his "humanitarian activities" and because he was a Christian missionary who assisted North Korean defectors.  Hawk Decl. ¶ 21; Downs Supp. Decl. ¶¶ 6(a)-(d), 7.  In particular, Downs states that he is "virtually certain that Reverend Kim's killing was motivated by political considerations."  Downs Supp. Decl. ¶ 7.  Hawk adds that in DPRK's penal camps, "prisoners are not formally arrested, charged (or even told of their offense), or tried in any sort of judicial procedure."  Hawk Decl. ¶ 11.  The South Korean court decision and the expert evidence reflect that Reverend Kim was abducted at the behest of DPRK security forces, not in accordance with any legitimate judicial or other process, due to Kim's religious work and assistance to North Korean refugees.

- 31 -

Therefore, the plaintiffs have sufficiently shown that any mistreatment of Reverend Kim was done purposefully.

However, the plaintiffs' submissions do not establish the severity of the treatment of Reverend Kim in particular, or that his treatment amounts to torture under the rigorous definition of that term adopted in the FSIA.  DPRK's failure to respond to the complaint or to respond to any of the congressional inquiries regarding Reverend Kim's fate, in part, obscures the precise details of Reverend Kim's treatment following his abduction by DPRK agents.  Moreover, the widely feared nature of DPRK repression appears to force those individuals who may know details about Reverend Kim's whereabouts and treatment to convey such information sparingly and anonymously.  See, e.g., Do Hee-Youn Decl. ¶ 2 (describing "network of individuals that have supplied . . . information concerning North Korean matters" and explaining "many of these individuals are kept confidential to ensure their safety from potential retribution against them by the North Korean government").  Unfortunately for plaintiffs, no D.C. Circuit opinion appears to allow such circumstances to lessen the plaintiffs' exacting burden of proof.

Here, the declarations of the plaintiffs and Butler reflect no actual knowledge of how Reverend Kim was treated in the DPRK. The South Korean court decision convicted a DPRK agent of

abducting Reverend Kim, but does not refer to Reverend Kim being
tortured.  The congressional resolutions and correspondence
sought, but did not provide, details about Reverend Kim's
treatment.  The State Department reports discussing abuse in DPRK
prisons and media speculation that Revered Kim died provide no
first-hand accounts detailing his treatment.  The reports from
Human Rights Watch and the United Nations provide no first-hand
accounts of Reverend Kim's mistreatment and do not detail the
frequency or duration of the acts of torture at the prison camps.
The Kirkpatrick book excerpt recounts information docketed in
this case but adds no first-hand information about Reverend Kim's
treatment, or any details about the nature or severity of his
torture, or the frequency or duration of any acts of torture or
the parts of his body at which they were aimed or any weapons
used to carry them out.  Two of plaintiffs' declarants, Do Hee-
Youn and Yoshikuni Yamamoto, recounted hearsay reports that
Reverend Kim was tortured and died.  The declarants did not,
though, reveal the sources of the reports, specify their bases of
knowledge, or provide useful details about the nature and
severity of any torture.

The experts in this case describe conditions at an
established and extensive system of penal colonies where the DPRK
regularly holds abductees and political prisoners, and opine that

reports from defectors stating that Reverend Kim was tortured and
is either still in custody or has died as a result of his
treatment are credible.  However, Hawk does not report that the
prisoners he spoke with had personal knowledge of Reverend Kim's
treatment.  Hawk also does not describe the nature or severity of
the torture Revered Kim suffered, or the frequency or duration of
acts of torture upon him or the parts of the body at which they
were aimed or any weapons used to carry them out.  Likewise,
Downs does not identify the sources he deems credible upon whom
he based his opinion that Reverend Kim probably died as a result
of deliberate torture and malnutrition.  He does not reveal their
bases of knowledge about Reverend Kim or say whether he has
spoken with them.  Nor does Downs provide details regarding the
severity of Reverend Kim's beatings.  <u>Price</u> constrains us from
employing discussion about the abuses generally in these camps to
show that mistreatment of Reverend Kim occurred that rose to the
level of torture under the TVPA.  As the plaintiffs have not
satisfied the requirements of the FSIA, subject matter
jurisdiction is lacking.

Although the plaintiffs have not provided sufficient
evidence to support jurisdiction under the FSIA, a district court
ruling on whether facts in a complaint adequately allege a basis
for invoking the torture exception under the FSIA should be

immediately appealable.  See Price, 294 F.2d at 92 (allowing

Libya to immediately appeal a district court decision rejecting

Libya's argument that the facts alleged in the complaint do not

bring the case within an FSIA immunity exception).  Moreover,

this case qualifies for an interlocutory appeal under 28 U.S.C.

§ 1292(b).  That statute provides that an interlocutory appeal

may be certified to the court of appeals when

> a district judge . . . shall be of the opinion that
> such order involves a controlling question of law as to
> which there is substantial ground for difference of
> opinion and that an immediate appeal from the order may
> materially advance the ultimate termination of the
> litigation.

28 U.S.C. § 1292(b).  "Under § 1292(b), a controlling question of

law is one that would require reversal if decided incorrectly or

that could materially affect the course of litigation with

resulting savings of the court's or the parties' resources[]" and

"include[s] issues that would terminate an action if the district

court's order were reversed."  APCC Servs., Inc. v. Sprint

Communic'ns Co., L.P., 297 F. Supp. 2d 90, 95-96 (D.D.C. 2003)

(internal citations and quotation marks omitted).  Here, the

determination of subject matter jurisdiction qualifies as a

controlling question of law.  See id.  Also, there is "a

substantial ground for difference of opinion" about whether

plaintiffs have presented the requisite quantum of evidence to

show that Reverend Kim was tortured under the FSIA.  Cf. Doe v.

Qi, 349 F. Supp. 2d 1258, 1312-17 (N.D. Cal 2004) (discussing Price and collecting cases applying the standard for sufficient factual allegations to allege torture under the FSIA). Finally, "[w]hen there are substantial grounds for difference of opinion as to a court's subject matter jurisdiction, courts regularly hold that immediate appeal may 'materially advance the ultimate termination of the litigation.'" Al Maqaleh v. Gates, 620 F. Supp. 2d 51, 55 (D.D.C. 2009). Certification for an interlocutory appeal in this case, then, is warranted.

## CONCLUSION AND ORDER

Subject matter jurisdiction over this action depends in part upon an adequate demonstration that Reverend Kim was tortured following his abduction. Plaintiffs have not met to the court's satisfaction the high standard recognized by this circuit under the FSIA for showing that Reverend Kim was tortured. Thus, the court lacks subject matter jurisdiction over this action. The motion for default judgment will be denied, and the case will be certified for interlocutory appeal on the issue of the requisite quantum of evidence for sufficiently alleging torture under the FSIA. Accordingly, it is hereby

ORDERED that plaintiffs' motion [14] for default judgment be, and hereby is, DENIED. It is further

- 36 -

ORDERED that this case be, and hereby is, certified for immediate appeal under 28 U.S.C. § 1292(b) because it involves a controlling question of law as to which there is a substantial ground for difference of opinion, and an immediate appeal may materially advance the ultimate termination of this litigation. It is further

ORDERED that all proceedings in this case be stayed upon the application of the plaintiffs for an interlocutory appeal under 28 U.S.C. § 1292(b) of the finding that the court lacks subject matter jurisdiction under the FSIA.

SIGNED this 14th day of June, 2013.


_____/s/_____
RICHARD W. ROBERTS
United States District Judge